UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JERMAINE FRANKLIN, JR., and
JERMAINE FRANKLIN JR., INC.,

                    Plaintiffs,                          Case No. 19-CV-10137

v.
                                                         Honorable Thomas L. Ludington
MARK F. HAAK,

                    Defendant.
_____/

**ORDER GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT, DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT,
DENYING PLAINTIFFS' MOTION TO AMEND AFFIRMATIVE DEFENSES,
DISMISSING PLAINTIFF'S COMPLAINT, AND DIRECTING DEFENDANT TO
SUBMIT A PROPOSED JUDGMENT**

On January 14, 2019, Plaintiffs Jermaine Franklin, Jr. and Jermaine Franklin, Jr., Inc., filed

this action against Defendant Mark F. Haak, alleging multiple counts relating to a boxer-manager

agreement between the parties. ECF No.1. On September 26, 2019, Defendant, the manager,

counterclaimed against Plaintiffs, the boxer and his corporation, for damages and declaratory

relief. ECF No. 27. Following Defendant's motion to dismiss, Plaintiffs' only remaining count is

for an equitable accounting based on Defendant's status as a fiduciary. ECF No. 29 at PageID.369.

On June 29, 2020, Plaintiffs moved for leave to file amended affirmative defenses. ECF No. 49.

Since then, Defendant and Plaintiffs have filed cross-motions for summary judgment. ECF Nos.

52, 54. Timely response and reply briefs have been filed for all pending motions. ECF Nos. 49,

50, 56–59. For the reasons stated below, Defendant's motion for summary judgment will be

granted in part, Plaintiffs' motion for summary judgment and motion to amend the complaint will

be denied, Plaintiffs' complaint will be dismissed, and Defendant will be directed to submit a

proposed judgment.

**I.**

**A.**

Plaintiff Jermaine Franklin, Jr. ("Franklin") is a professional boxer and a resident of Michigan. ECF No. 1. Plaintiff Jermaine Franklin, Jr., Inc. is a Michigan corporation. ECF No. 1. Defendant Mark F. Haak is an attorney, boxing manager, and resident of Pennsylvania. Shortly after winning the U.S. National Golden Gloves Championship in 2014, Franklin was introduced to Defendant by Franklin's uncle and former boxer James Dixon. ECF No. 52-2 at PageID.763 (Franklin's deposition). Defendant flew Franklin, Dixon and Franklin's parents to Pittsburgh, Pennsylvania to meet with him and Mike Acri, a former promoter and close associate of Defendant. *Id.* at PageID.766. On December 16, 2014, during the Pennsylvania trip, Franklin and Defendant entered into a contract entitled "Boxer-Manager Agreement" (the "Agreement"). *Id.* The Agreement provides, in relevant part:

1. Employment of Boxer

   By this Agreement, Manager engages Boxer, and Boxer agrees for a period of [four years and six months] from the date of execution of this Agreement to render services exclusively for Manager in such boxing contests, exhibitions of boxing, and training exercise, whenever required by Manager, as Manager may from time to time direct.

2. Boxer's Compensation

   a. Manager will be paid 30% of all amounts derived by Boxer from any services Boxer may render under this Agreement.

   b. Manager hereby agrees to pay Boxer $10,000 at the time of the signing of this Agreement as a signing bonus.

   c. Manager further agrees that during the first year of the contract, Manager will pay Boxer the sum of $1,200 per month on or before the first day of each month, commencing February 1, 2015, continuing through 2015, and concluding January 1, 2016 (12 payments).

    d.   Manager agrees that during the first year of the contract, Boxer will have no duty to pay any share of any proceeds that Boxer receives from any services that Boxer may render under this Agreement to Manager.

    e.   Boxer acknowledges that Manger has no further responsibility to pay Boxer any money after the first year of the contract.

    f.   Manager has no duty at any time to pay miscellaneous expenses . . .

3.   Option

Boxer hereby grants to Manager an unconditional option to extend this Agreement an additional two years immediately following the aforementioned five year period upon payment by Manager to Boxer the sum of [$25,000] on or before the expiration of the five year anniversary of this [Agreement].

4.   Manager's Efforts

Manager agrees to use his best efforts to secure remunerative boxing contests for Boxer . . .

6.   Injuries/Extensions

If Boxer is unable or unwilling to box due to injuries, substance abuse, or any other reason, this Agreement is automatically extended for a period of time equal to the amount of time Boxer is/was unable or unwilling to box.

7.   Exclusivity of Contract

Boxer agrees that Boxer will not during the continuance of this Agreement take part in any boxing contests or other exhibitions, perform or otherwise exercise Boxer's talent in any manner or place, except as directed by Manager, and shall not allow Boxer's name to be used in any commercial enterprise without obtaining the prior, express, and written permission of Manager so to do . . .

10.  Manager/Boxer Licensing

Manager and Boxer will become licensed when and where necessary, in the appropriate jurisdiction, at the appropriate time, at the discretion of Manager.

14.  Entire Agreement

This Agreement shall constitute the entire agreement between the parties and any prior understanding or representation of any kind preceding the date of this Agreement shall not be binding upon either party except to the extent incorporated in this Agreement . . .

16. Assignment of Rights

> The rights of each party under this Agreement are personal to that party and may not be assigned or transferred to any other person, firm, corporation, or other entity without the prior, express, and written consent of the other party . . . .

ECF No. 18-2.[1] Defendant signed as "Manager" and Franklin as "Boxer." *Id.* Franklin testified during his deposition that he did not fully understand the Agreement when he signed it. ECF No. 52-2 at PageID.766. Nonetheless, he remained quiet while Defendant reviewed the Agreement with everyone present. *Id.* at PageID.766, 768. He trusted that Dixon, who had "all the knowledge," would "protect him," and Dixon apparently "raised no red flags." *Id.* After the Agreement was signed, Defendant paid Franklin his signing bonus of $10,000. *Id.* at PageID.769. Defendant also paid Franklin his monthly salary of $1,200 over the next 12 months. *Id.*

## C.

Franklin went on to fight and win 17 contests under Defendant's management, amassing an undefeated professional record of 17-0. ECF No. 52-2 at PageID.770. Despite his flawless record, Franklin believed that he was "not a priority" under Defendant's management. *Id.* at PageID.772. He testified that when he signed the Agreement, he thought he was entering into a "business partnership," but to him, the actual relationship "turned out to not be that at all." *Id.* at PageID.768. Defendant was responsible for essentially every business aspect of Franklin's career. *Id.* at PageID.763–64. When it came to matchmaking, Defendant, with the help of Acri, identified opponents and communicated with promoters.[2] *Id.* Franklin voiced his opinion from time to time

---

[1] Handwritten alterations are reflected in brackets.

[2] At his deposition, Franklin expressed frustration with Acri's involvement and his belief that, in some respects, Acri was the real decisionmaker. *See, e.g.*, ECF No. 52-2 at PageID.764 ("I just felt like somebody that's not on paper shouldn't have that much control . . . I just felt like if he's on the outside giving advice, he has more control over my career than I do.").

but believed that "[n]obody cared." *Id.* at PageID.772. As Franklin saw it, he "d[id] all the work" and "t[ook] all the beatings" but, in the end, had no say over the direction of his career. *Id.*

Franklin's compensation was also a source of tension. In boxing, a boxer's compensation for a bout is referred to as a "purse." Franklin's purse was usually around $2,000 for each bout as stated in a "bout agreement" that he and the promoter would execute.[3] *See* ECF No. 56-1 (Defendant's itemized accounting); *see also* ECF No. 52-2 at PageID.769–70, 773. Sometimes Defendant handed him the money; sometimes the promoter did. *Id.* at PageID.769. In almost every case, however, the bout agreement was limited to describing who was going to be paid but not how the transaction would be executed.

Defendant, it turns out, elected to pay for all of Franklin's purses and nearly every other expense related to his career, including his opponent's purse. *See* ECF No. 56-1. The arrangement worked as follows: Prior to an event, Defendant, usually through Acri, would negotiate a bout agreement with the promoter and Franklin's opponent. ECF Nos. 54-9, 54-10, 57-7 (excerpts from Defendant's deposition).[4] Defendant would then send a check to the promoter with instructions to pay both fighters' purses and the promoter's fee. *See, e.g.*, ECF No. 54-2 (Defendant's letter and check to promoter Carlos Llinas). Franklin's purse was often less than his opponent's, and Franklin did not always know his opponent's purse. *See* ECF No. 52-2 at PageID.769–70; ECF No. 56-1. While this arrangement seems counterintuitive—especially for a manager whose fee is based on a percentage of the purse—Defendant explained in a declaration that advancing a boxer's costs to "build a record" is normal in the industry:

> Generally, a professional earns very little money at the beginning. By far, most boxers are largely unsuccessful and never even earn a living wage from boxing . . . In a few rare instances, a boxer who builds a significant record against progressively better opponents has an opportunity to box in televised boxing

---

[3] The parties have not produced all 17 bout agreements.
[4] The parties have not produced Defendant's deposition in its entirety.

matches where networks and/or promoters pay progressively more money . . . A boxer will generally need someone to pay all of his expenses including monies to him, for training and to the opponents until he generates a strong enough record and recognition to generate proceeds from his fights.

ECF No. 14-1 at PageID.145–46.[5] Defendant was intent on being that "someone." On June 15, 2015, for example, he paid $100 for new running shoes. ECF No. 56-1 at PageID.867. On March 14, 2016, he paid $3,000 for a Chevy Impala. *Id.* at PageID.870. On June 9, 2017, he paid $300 to Franklin's trainer, $600 for hotel rooms, $100 for fight tickets, and $24 in tolls driving to and from Pittsburgh, Pennsylvania and Youngstown, Ohio. *Id.* at PageID.873. That same day, Franklin knocked out Danny Calhoun at St. Lucy's Palermo Hall in Youngstown, advancing his undefeated record to 11-0. Defendant paid $260 for the team dinner afterwards. *Id.* at PageID.872–73.

From 2014 through 2018, Defendant paid roughly $300,000 to advance Franklin's career,[6] even though, under paragraph 2.f of the Agreement, he had "no duty at any time to pay miscellaneous expenses." ECF No. 18-2. When asked about all these expenses at his deposition, Defendant reiterated his earlier sentiment:

> If I don't pay the money, [Franklin] doesn't get to the fight. If [Franklin] doesn't get to the fight, his career doesn't advance. If his career doesn't advance, neither of us ever make any money. So every dollar I put in was put in with the expectation that I needed to put it in to move his career along . . . [I] spent with the sole objective of moving his career along. The sole objective of getting to a point where we can negotiate a contract with a promoter and get him on TV.

ECF No. 57-3 at PageID.903–04. Despite his considerable investment in Franklin, Defendant denies receiving any income from managing Franklin—a claim supported by his tax filings. *See* ECF No. 54-6; *see also* ECF No. 14-1 at PageID.145 (Defendant's declaration). However, he did

---

[5] Neither party has produced expert testimony, or any other evidence, describing the ordinary boxer-manager relationship or explaining whether managers ordinarily finance bouts early in the relationship.
[6] A portion of Defendant's itemized accounting, ECF No. 56-1, will be published with this opinion to illustrate the payments made.

deduct these expenses on his federal tax returns. *See* ECF No. 54-7 (Defendant's deposition); *see also* ECF No. 54-6 (Defendant's 2018 Schedule C (Form 1040)).

During his deposition, Defendant was asked whether he thought one of his duties was to "try and find [Franklin] well-paying fights?" ECF No. 54-9. He responded by referring to the "best efforts" clause of the Agreement, stating,

> [T]he contract is "manager agrees to use his best efforts to secure remunerative boxing contests for boxer." And that's what I did. Remember, this is a platform, it's a stepping stone to get him to where the real money is. This is a transitory phase . . . [B]uilding a record as a boxer, there isn't any money at the low levels. If there isn't any TV, there really isn't much money. You have to go through this to be in a position to make money.

*Id.* Franklin's counsel then asked him, "Why didn't you just then cut out the promoter and pay [Franklin] directly? Why go through sending a check or paying the promoter and telling the promoter pay the opponent this amount and then pay [Franklin] this amount?" Defendant answered,

> I wanted [Franklin] to see money coming from third parties because at some point in his career, that's the way it was going to be. Just like in every fight I tried to make him the main event . . . [H]e was clearly the best guy on most cards, but they don't care who the main event is in these little fights. I wanted him to be used to waiting so that later on in his career . . . when he's got big fights with a lot of money against real guys that could potentially beat him, he gets used to waiting around.

*Id.* Franklin had a different opinion. To him, the money going to opponents and promoters was being "wasted."[7] ECF No. 52-2 at PageID.771. During his time boxing for Defendant, Franklin worked other jobs to support himself and his children. *Id.* at PageID.763. After his win over Tyrell Wright in October 2017, Franklin considered quitting boxing altogether. ECF No. 52-2 at PageID.772. He told Defendant that he "couldn't survive" on the current purses, but Defendant, he explained, "blew [him] off." *Id.* Franklin emphasized his frustration at his deposition:

---

[7] Although it is unclear to what extent Franklin knew that Defendant was financing his bouts and paying miscellaneous expenses, the record establishes at least some awareness. *See* note 17, *infra*.

> [I]t's hard to be full-time boxer, a full-time parent, and still like try to work . . . Like I've got kids, I've got to buy food, clothes and stuff. Like I can't do that with 2,000, $3000. That's gone like in the month . . . [but] when I go to camp, it's either I'm in trouble with my job or I'm losing my job. And after [a while], jobs just stop.

*Id.* at PageID.772–73. Franklin confirmed that he always received his full purse but maintained that what he really wanted was control over his career. ECF No. 52-2 at PageID.772.

**D.**

On July 12, 2018, Defendant met with promoter Dmitry Salita to discuss a potential promotional contract for Franklin. ECF No. 57-4. Salita, a promoter for world champion boxer and Flint-native Claressa Shields, had shown an interest in promoting Franklin. *Id.* It is unclear what, if anything, resulted from the meeting. The next day, July 13, 2020, Franklin fought, in his view, his last fight under Defendant's management.

On August 10, 2018, Franklin sent an email to Defendant through the email account of his mother Andrea Lamar. Franklin claimed that the Agreement was unconscionable and illegal under Pennsylvania law and requested mutual rescission. ECF No. 54-3. On August 15 and 16, 2018, Lamar and Defendant exchanged emails regarding Franklin and the Agreement. ECF No. 54-4. Lamar restated Franklin's desire to rescind the agreement and asked for a meeting with Defendant. *Id.* at PageID.828. She also asked Defendant to bring along paperwork "showing what [Defendant] paid [Franklin]" and "what each opponent [Franklin] fought was paid and what promotional cost was paid out and to who[m]." *Id.* Defendant agreed that a meeting was in order and stated he would "bring everything" to their meeting. *Id.* The meeting never happened.

On August 21, 2018, Aaron Alfaro ("Alfaro"), Franklin's spokesperson, sent an email to Defendant restating Franklin's request to "terminate" the Agreement. ECF No. 54-5. Alfaro also requested that Defendant provide the following within three business days:

> A full accounting of each bout, including but not limited to, costs, payments, and sub contracts that were signed on his behalf.
>
> Paper and electronic documentation of payments to [Franklin], for each fight you managed for him along with total purse for each fight
>
> All promotional contracts you enter [sic] into on [Franklin's] behalf for reach of his fights and what was paid to Media, Promotions, Marketing, etc [sic].

*Id.* There is no indication that Defendant responded to Alfaro. Shortly thereafter, Franklin's counsel in this matter sent two letters to Defendant restating Franklin's position and asking Defendant to produce an accounting of monies he had received. ECF No. 18-5 at PageID.214–17 (August 27 and September 12, 2018 letters). Other than an apparently hostile phone call on August 31, 2018, Defendant did not respond. *Id.*

On October 24, 2018, Franklin entered into a contract with Salita Promotions, Corp. ("Salita Promotions") whereby Salita Promotions was to become Franklin's exclusive promoter. ECF No. 52-3. The contract provided for a $20,000 signing bonus, a $75,000 purse for his first bout, and, if he won the first bout, a $25,000 minimum purse thereafter. *Id.*

On November 14, 2018, Defendant sent a letter to Salita Promotions indicating that Defendant was Franklin's manager and that only Defendant could select Franklin's promoters. ECF No. 18-5 at PageID.211–13. On December 18, 2018, Defendant sent a similar letter to Gordon Hall, Senior Vice President for Showtime Networks Inc., informing him that Franklin's contract with Salita Promotions was executed without Defendant's consent and that Franklin was not authorized to fight in any upcoming Showtime events.  ECF No. 18-7. On January 14, 2019, Salita Promotions wrote Franklin's counsel, informing her that because of Defendant's threatened litigation, Salita Promotions would not offer Franklin any fights until the dispute between Franklin and Defendant was resolved. ECF No. 18-8. Defendant has fought three times since and remains

undefeated with a record of 20-0. His last fight was in October 2019. *Jermaine Franklin*, BoxRec, https://boxrec.com/en/proboxer/716569 (last visited Oct. 26, 2020).

**E.**

Plaintiffs filed the original seven-count complaint against Defendant on January 14, 2019. ECF No. 1. On March 1, 2019, the parties stipulated to an order requiring an informal exchange of discovery and holding Defendant's rights under the Agreement in abeyance. ECF No. 11. On April 30, 2019, Plaintiffs filed an amended complaint pursuant to a stipulated order adding a count for breach of fiduciary duty. ECF No. 18. Defendant subsequently moved to dismiss the amended complaint. ECF No. 19. Defendant also counterclaimed for damages and declaratory relief regarding the enforceability of the Agreement. ECF No. 27.

On January 21, 2020, Defendant's motion to dismiss was granted in part. ECF No. 29. All counts were dismissed except for the breach of fiduciary duty count. *Id.* On February 4, 2020, Defendant moved for a declaratory judgment on the pleadings. ECF No. 31. Defendant requested a declaration that "(1) the [Agreement] is valid, (2) Franklin is not permitted to unilaterally terminate the [Agreement], (3) [Defendant] was and still remains Franklin's manager, and (4) there are two years and 310 days remaining in the contract term." *Id.* at PageID.373.

Defendant's motion was granted in part. ECF No. 37. The Agreement was declared valid, but this Court declined to reach Defendant's other declaratory relief because doing so would require passing on a question that was not ripe for attention; namely, "whether Franklin was lawfully permitted to terminate the Agreement." *Id.* at PageID.493. As this Court explained, even though Plaintiffs' breach of contract claim was dismissed, "it is possible that Plaintiffs' claim of failure to provide an accounting will produce material demonstrating that Defendant in fact retained more than he was due under the Agreement." *Id.* at PageID.492.

-10-

On June 29, 2020, Plaintiffs moved to amend their affirmative defenses. ECF No. 48. On August 11, 2020, the six-month discovery period ended. ECF No. 33. A settlement conference held two weeks later failed to produce a resolution. The parties have now filed cross-motions for summary judgment. ECF Nos. 52, 54. All pending motions have been fully briefed. ECF Nos. 49, 50, 56–59.

## II.

### A.

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

### B.

Leave to amend shall be given freely "when justice so requires." Fed. R. Civ. P. 15(a)(2). "[W]here the underlying facts would support a claim leave to amend should be granted, except in cases of undue delay, undue prejudice to the opposing party, bad faith, dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or futility." *Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999). "[A] motion for leave is properly denied if the court

concludes that the pleading as amended could not withstand a motion to dismiss or a motion for judgment on the pleadings." *Hammons v. Barkdull*, No. 6:19-CV-00128-GFVT, 2020 WL 2545319, at *1 (E.D. Ky. May 18, 2020) (internal quotation marks omitted). To survive a motion to dismiss under FRCP 12(b)(6), "[a] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Vest v. Resolute FP US Inc.*, 905 F.3d 985, 987 (6th Cir. 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). Similarly, when considering a motion for judgment on the pleadings, "the court must accept all the factual allegations of the complaint as true" and may grant the motion only if "no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law." *Paskvan v. City of Cleveland Civil Serv. Comm'n*, 946 F.2d 1233, 1235 (6th Cir. 1991).

### III.

Defendant moves for summary judgment on his declaratory judgment claim and against Plaintiffs' affirmative defenses and accounting claim. Regarding declaratory relief, he asks this Court to declare that "(1) Franklin may not unilaterally terminate the contract, (2) [Defendant] remains Franklin's manager, and (3) 1,040 days remain in the contract term from the entry of final judgment." *Id.* Plaintiffs' accounting claim is addressed in Section IV., *infra*. For the reasons stated below, there is no genuine issue of material fact regarding the enforceability of the Agreement, and Defendant is entitled to at least part of the declaratory relief requested.

### A.

Whether Franklin was entitled to terminate the Agreement turns on the issue of material breach.[8] "Under Michigan law, where one party to a contract commits a material breach, the nonbreaching party is entitled to terminate the contract." *Convergent Grp. Corp. v. Cty. of Kent*,

---

[8] Because Plaintiff Jermaine Franklin, Jr., Inc. raises no independent arguments, the opinion refers to Franklin rather than Plaintiffs collectively.

266 F. Supp. 2d 647, 657–58 (W.D. Mich. 2003) (citing *Lynder v. S.S. Kresge Co.*, 45 N.W.2d 319, 325 (Mich. 1951)). To determine whether a breach is material, Michigan courts consider several factors:

> [1] Whether the nonbreaching party obtained the benefit it reasonably expected to receive . . . [2] the extent to which the injured party may be adequately compensated for damages for lack of complete performance, [3] the extent to which the breaching party has partly performed, [4] the comparative hardship on the breaching party in terminating the contract, [5] the [willfulness] of the breaching party's conduct, and [6] the greater or lesser uncertainty that the party failing to perform will perform the remainder of the contract.

*Omnicom of Michigan v. Giannetti Inv. Co.*, 561 N.W.2d 138, 141 (Mich. Ct. App. 1997) (citing *Walker & Co. v. Harrison*, 81 N.W.2d 352 (Mich. 1957)). Defendant's responsibilities under the Agreement are rather straightforward. Defendant was required to (1) pay Franklin $10,000 as a signing bonus, (2) pay Franklin a first-year monthly salary of $1,200, (3) and "use his best efforts to secure remunerative boxing contests." ECF No. 18-2. In exchange, Defendant was entitled to 30% of Franklin's purses. *Id.* Franklin admits that he received his first-year salary and signing bonus, ECF No. 52-2 at PageID.769, and there is no evidence that Defendant retained any part of Franklin's purses, despite his rights under the Agreement. Nonetheless, Franklin proposes two theories of breach: the first related to the "best efforts" clause; the second related to Defendant's fiduciary duties as manager. Alternatively, he argues that this Court should exercise its equitable discretion to rescind the Agreement.

### 1.

Franklin's principal theory of breach is that Defendant failed to exercise his best efforts in securing remunerative boxing contests. ECF No. 57 at PageID.887. Citing Defendant's failure to secure a deal with Salita, Franklin claims that "[Defendant] turned down facially acceptable offers without consulting or considering if it was in Franklin's financial best interest." *Id.* at PageID.888.

He further claims that the contests negotiated by Defendant were not "remunerative." *Id.* Neither argument is compelling.

First, the record is devoid of any evidence that Defendant turned down a promotional offer from Salita. The record merely shows that Salita expressed an interest in promoting Franklin and that Salita and Defendant met once before one of Franklin's bouts. ECF No. 57-4. Moreover, even if Defendant rejected an offer from Salita, Franklin fails to explain how doing so constituted a material breach. The Agreement required Defendant to use his best efforts to secure "remunerative contests," not contests with any particular promoter. *See* ECF No. 18-2.

Additionally, the term "best efforts" has a specific meaning in contract law. As the Sixth Circuit has explained, "While the phrase 'best efforts' is often used to describe the extent of the implied undertaking, this has properly been termed an 'extravagant' phrase. A more accurate description of the obligation owed would be the exercise of 'due diligence' or 'reasonable efforts.'"[9] *Permanence Corp. v. Kennametal, Inc.*, 908 F.2d 98, 100 (6th Cir. 1990) (internal citations omitted). Franklin produces no evidence from which a reasonable jury could infer a lack of reasonable effort or diligence. Defendant had a plan to get Franklin to the "real money," and, in executing that plan, he secured 17 contests and invested hundreds of thousands of dollars.

Franklin points to Acri's involvement as evidence that Defendant "abdicate[d] his duties" and suggests that Defendant had some improper "allegiance" toward Acri.[10] ECF No. 57 at PageID.896. The record confirms that Acri had substantial involvement in negotiating with

---

[9] Michigan's version of the Uniform Commercial Code requires an exclusive dealer of goods to use her "best efforts to promote their sale." M.C.L. § 440.2306(2) (adopting U.C.C. § 2-306). The official comments clarify that "best efforts" require "reasonable effort and due diligence." *Id.* § 440.2306(2), cmt. 4. A boxing manager is an exclusive dealer of the boxer's services, so the comparison is persuasive.

[10] Franklin also suggests that Defendant improperly "assigned" his rights under the Agreement by employing Acri. ECF No. 48 at PageID.634. Franklin seems to confuse the assignment of rights with the delegation of duties. "[A]n obligor can properly delegate the performance of his duty to another unless the delegation is contrary to public policy or the terms of his promise." *UAW-GM Human Res. Ctr. v. KSL Recreation Corp.*, 579 N.W.2d 411, 422 (Mich. Ct. App. 1998) (quoting Restatement (Second) of Contracts, § 318 (Am. Law Inst. 1981)).

opponents and promoters, but otherwise, Franklin's argument is without support. There is no evidence that Acri ever acted against Defendant's direction or against Franklin's best interests. At most, the evidence shows that Franklin believed Acri was more involved in his career decisions than Defendant wanted but Franklin's perspective is limited. He admits that he "wasn't with [Defendant] every day." ECF No. 52-2 at PageID.772. Furthermore, there is no reason to believe that hiring a consultant like Acri was outside Defendant's discretion as manager. While Franklin may have been disappointed with Defendant's promotional strategy,[11] Defendant's performance is measured by his effort and diligence, not Franklin's satisfaction.

Furthermore, Franklin's contention that the contests were not "remunerative" is meritless. "Dictionary definitions may be used to ascertain the plain and ordinary meaning of terms undefined in an agreement." *Coates v. Bastian Bros., Inc.*, 741 N.W.2d 539, 544 (Mich. Ct. App. 2007). "Remunerative" is defined as "providing remuneration; profitable," and to "remunerate" is to "pay an equivalent for a service, loss, or expense." *Remunerative*, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/remunerative; *Remunerate*, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/remunerate. As a matter of law, it is simply untenable to suggest that the 17 purses, each around $2,000, were not "remunerative," even if they were not *as* remunerative as the purses promised by Salita Promotions—which, notably, were promised after Franklin had already amassed a 17-0 record with Defendant.

---

[11] For instance, Franklin suggested at his deposition that he wanted to fight more local opponents to save money on promotional expenses and earn more from selling tickets. ECF No. 52-2 at PageID.770–71. Defendant's failure to heed Franklin's suggestions cannot be a breach of the Agreement where the Agreement did not require local opponents and, in fact, vested Defendant with the authority to direct Franklin's services. *See* ECF No. 18-2 (paragraph one of the Agreement).

**2.**

Franklin's second theory of breach is premised on Defendant's status as a fiduciary. Specifically, he contends that Defendant's failure to furnish Franklin with 1099-MISC payee statements, which allegedly exposed Franklin to tax liability,[12] was a substantial fiduciary breach entitling Franklin to terminate the Agreement. ECF No. 54 at PageID.810–11. This theory is bizarre for two reasons. First, no evidence of Franklin's tax liability is offered and no legal authority is offered for the proposition that, as his fiduciary, Defendant had a duty to furnish 1099-MISC payee statements.[13] The record only reflects that Defendant did not furnish 1099-MISC statements for tax years 2014 to 2017 and that the 2018 statement was higher than the sum of Franklin's purses.[14] ECF Nos. 54-8, 57-5. Of course, Defendant may have had a statutory duty to furnish 1099-MISC statements, 26 U.S.C. §§ 6041, 6041A, and his failure to do so may have exposed him to IRS penalties.[15] 26 U.S.C. § 6722. Fiduciary duties, however, are not necessarily coextensive with tax law.

Second, assuming Defendant's conduct violated a fiduciary duty, it does not follow that Franklin was entitled to walk away from the Agreement. Franklin's reference to *Able Demolition*

---

[12] An independent contractor has a duty to report his income regardless of whether he is furnished with a 1099-MISC statement. *Sweeney v. Comm'r of Internal Revenue*, No. 7510-15S., 2016 WL 3660790, at *3 (T.C. July 5, 2016) ("[Petitioner's] alleged nonreceipt of the Forms 1099-MISC is not a defense; many taxpayers receive taxable income for which Forms W-2 and Forms 1099-MISC are not provided, but they are nevertheless obligated to report such income.") (internal citations omitted).

[13] Franklin contends that if Defendant was not required to furnish 1099-MISC statements under the Agreement, then the Agreement is illegal. ECF No. 59 at PageID.940. However, the Agreement is silent with respect to tax reporting, and "[a]s a general matter, courts presume the legality, validity, and enforceability of contracts." *Coates v. Bastian Bros., Inc.*, 741 N.W.2d 539, 545 (Mich. Ct. App. 2007). "A contract need not state that it will operate in accordance with governing law to be valid." *Michigan State AFL-CIO v. Schuette*, 847 F.3d 800, 804 (6th Cir. 2017).

[14] Neither party filed the 2018 statement with their briefing. The statement allegedly indicates that Defendant paid Franklin $11,263.00 in 2018, while Franklin's two purses that year add up to $5,000. ECF No. 54 at PageID.812. Based on Defendant's accounting and excerpts from his deposition, the difference is likely attributable to Defendant inclusion of miscellaneous expenses as amounts paid to Franklin on the 1099. *See* ECF No. 57-5 at PageID.909 ("Going through the actual money that I sent to [Franklin], it adds up to the number I gave you."); ECF No. 56-1 (listing numerous miscellaneous expenses for 2018).

[15] Indeed, the lack of 1099's, including 1099's that, presumably, should have been issued by promoters, has diminished the record.

-16-

*v. Pontiac*, 739 N.W.2d 696 (Mich. Ct. App. 2007), is inapposite. *Able Demolition* held only that a demolition company's failure to obtain a contractually required "letter to proceed" prior to demolition constituted a material breach. *Able Demolition*, 739 N.W.2d at 701–02. Here, by contrast, the 1099-MISC statements were not an "essential term of the contract." *Able Demolition*, 739 N.W.2d at 702. Indeed, the Agreement is silent with respect to tax preparation and accounting. And while there is no evidence that Defendant's failure was willful or that Franklin lacked a remedy at law, termination would inflict a substantial hardship on Defendant who has expended substantial resources performing under the Agreement. *C.f. Omnicom*, 561 N.W.2d at 141. Accordingly, as a matter of law, Defendant's failure to furnish appropriate tax forms did not entitle Franklin to terminate the Agreement.

### 3.

Alternatively, Franklin argues that the Agreement should be rescinded because of Defendant's inequitable conduct.[16] In support, he raises another alleged breach of fiduciary duty: Defendant's failure to disclose the fact that he was financing Franklin's bouts. ECF No. 54 at PageID.817.

"Because a claim to rescind a transaction is equitable in nature, it is not strictly a matter of right but is granted only in the sound discretion of the court." *Bazzi v. Sentinel Ins. Co.*, 919 N.W.2d 20, 29–30 (Mich. 2018) (internal quotation marks omitted). "[R]escission should not be granted in cases where the result thus obtained would be unjust or inequitable." *Id.* (citing *Amster v. Stratton*, 244 N.W. 201, 202 (Mich. 1932)). As a threshold matter, it is unclear that Defendant violated any fiduciary duty. As stated above, Franklin offers no authority supporting a fiduciary duty to furnish 1099-MISC statements, and Franklin's disclosure theory is similarly problematic.

---

[16] While Franklin's material breach and rescission arguments blur at times, they are construed as independent.

While a "fiduciary has an affirmative duty to disclose," *Silberstein v. Pro-Golf of Am., Inc.*, 750 N.W.2d 615, 624 (Mich. Ct. App. 2008), there is no evidence that Defendant's practice of financing bouts was material.[17] *See* 1 Mich. Civ. Jur. Agency § 106 ("It is an agent's duty to inform the principal fully of all facts relating to the subject matter of the agency that come to the agent's knowledge and that are material for the principal to know for the protection of his or her interests."). Perhaps Franklin thought that every purse came from the promoter's pocket, but that expectation was not reflected in the Agreement. Furthermore, discovery has revealed no hint of traditional impropriety like self-dealing. *C.f. Detroit Lions, Inc. v. Argovitz*, 580 F. Supp. 542, 548 (E.D. Mich. 1984) (permitting rescission of player's contract with team where player's agent failed to disclose ownership interest in team), *aff'd in part, remanded in part*, 767 F.2d 919 (6th Cir. 1985). Defendant had no hidden stake in financing Franklin's bouts and his uncontroverted testimony is that "what [he] paid [Franklin's] opponent had no relevance to what [he] paid [Franklin]." ECF No. 57-7 at PageID.915.

More principally, though, even if Defendant breached his fiduciary duties as alleged, rescission would be inequitable. *Bazzi*, 919 N.W.2d at 31 (holding that insurer was not entitled to rescission of insurance policy as matter of law despite fraudulent inducement). The record shows that Defendant invested substantial resources in reliance on the Agreement. Indeed, substantially more than the Agreement required. While Franklin depicts Defendant as a "fraud," ECF No. 57 at PageID.895, there is no indication that any alleged breach by Defendant was willful. Furthermore,

---

[17] This, of course, assumes that Franklin was unaware that Defendant was financing his bouts. Defendant testified that he "assumed" Franklin knew based on Franklin receiving "advances" on his purse from time to time and other circumstantial facts. ECF No. 59-6. Franklin seemed to confirm this assumption at his deposition, stating,

> We did voice our opinion, we let him know that, where you could have – we could have went to a place where you could have paid me a couple thousand after I sold tickets. You could have paid for a cheaper opponent and you wouldn't have to spend that much money.

ECF No. 52-2 at PageID.770–71.

if Franklin had proved some harm as a result of Defendant's conduct, he would have a remedy at law in the form of damages. Accordingly, the Court finds that allowing Franklin to rescind the Agreement would be inequitable.

Franklin's other affirmative defenses, such as unconscionability, are unsupported by the record, unexplored in the briefing, and were previously held unpersuasive. *See* ECF No. 37 (order granting judgment on the pleadings in part). Accordingly, given the discussion above, there is no genuine dispute of a material fact regarding the enforceability of the Agreement.

**B.**

The next issue is whether Defendant is entitled to a declaration that "(1) Franklin may not unilaterally terminate the contract, (2) [Defendant] remains Franklin's manager, and (3) 1,040 days remain in the contract term from the entry of final judgment." In determining whether entering a declaratory judgment under 28 U.S.C. § 2201 would be appropriate, a court must consider:

> (1) when the judgment will serve a useful purpose in clarifying and settling the legal relationship in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding. It follows that when neither of these results can be accomplished, the court should decline to render the declarations prayed.

*Grand Trunk Western R.R. Co. v. Consolidated Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984). A court should also consider the following five specific factors:

> (1) whether the judgment would settle the controversy;

> (2) whether the declaratory judgment action would serve a useful purpose in clarifying the legal relations at issue;

> (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata";

> (4) whether the use of a declaratory action would increase the friction between our federal and state courts and improperly encroach on state jurisdiction; and

> (5) whether there is an alternative remedy that is better or more effective.

*Scottsdale Ins. Co. v. Roumph*, 211 F.3d 964, 968 (6th Cir. 2000).

### 1.

The factors above support a declaration that Franklin may not unilaterally terminate the Agreement and that Defendant remains Franklin's manager. This Court declined to make such a declaration when Defendant moved for judgment on the pleadings because, at that time, it was possible that discovery would produce evidence of a material breach. ECF No. 37 at PageID.492. Now, the case is ripe for declaratory relief. Given that this case concerns the enforceability of the Agreement and the parties' rights thereunder, the requested declaration would substantially settle the controversy and clarify the legal relations at issue. Additionally, while Defendant had an alternative remedy at law, he has expressly elected "declaratory relief instead of damages." ECF No. 52 at PageID.719. Therefore, an order will be entered declaring that Franklin may not unilaterally terminate the Agreement and that Defendant remains Franklin's manager.

### 2.

With respect to time remaining on the Agreement, however, relief can only be afforded in part. Defendant's proposed declaration is based on the notion that the "clock stopped" on the Agreement when Franklin tried to unilaterally terminate on August 10, 2018. ECF No. 52 at PageID.727–28. Defendant's arguments in support are ultimately unpersuasive.

Defendant first argues that paragraph six of the Agreement automatically tolled the expiration date. *Id.* at PageID.728. Paragraph six states, "If Boxer is unable or unwilling to box due to injuries, substance abuse, or any other reason, this Agreement is automatically extended for a period of time equal to the amount of time Boxer is/was unable or unwilling to box." ECF No. 18-2. However, Franklin was not "unable or unwilling to box." He wanted to box. In fact, two months after trying to terminate the Agreement, Franklin signed a contract with Salita Promotions

and has boxed three times since. ECF No. 52-3. Michigan courts "give the words used in [a] contract their plain and ordinary meaning that would be apparent to a reader of the instrument." *Rory v. Cont'l Ins. Co.*, 703 N.W.2d 23, 28 (Mich. 2005). Defendant's interpretation would be plausible if the words "for Manager" were included after "unable or unwilling to box." Regardless, because "the contractual language is unambiguous," this Court "must interpret and enforce the contract as written." *In re Smith Tr.*, 745 N.W.2d 754, 758 (Mich. 2008).

Defendant also contends that, under Michigan law, courts can "extend a restrictive covenant's expiration date where a party has 'flouted' its terms." ECF No. 52 at PageID.729. Defendant principally relies on *Thermatool Corp. v. Borzym*, 575 N.W.2d 334 (Mich. Ct. App. 1998). In *Thermatool*, the Michigan Court of Appeals held that "[i]n cases where a party has flouted the terms of a noncompetition agreement, the court should be able to fashion appropriate equitable relief despite the fact that the parties did not expressly provide for such relief in their agreement." *Thermatool*, 575 N.W.2d at PageID.338. No such relief is necessary here because Defendant is not alleging breach of a noncompete agreement. The Agreement does not prohibit Franklin from competing against Defendant; rather, it makes Defendant the exclusive broker of Franklin's services. This distinction is more than semantic. *Thermatool* was motivated by a problem peculiar to noncompete agreements: the lack of a legal remedy for the injured party. The Michigan Court of Appeals explained, "[A]s courts allowing extensions of the terms of noncompetition agreements have found, it may not be possible to determine monetary damages with any degree of certainty. Where this is the case, the breaching party should not be rewarded because the agreement has already expired." *Id.* In contrast, Defendant's damages, had he opted to pursue them, would be readily determinable based on his 30% management fee.

Consequently, there is no legal basis for measuring the time remaining on the Agreement from August 10, 2018. The time remaining on the Agreement should instead be calculated from March 1, 2019, when the parties stipulated to an order stating, "[A]ny rights that Defendant may have under a management contract or otherwise with Plaintiff shall be held in abeyance pending resolution of this lawsuit." ECF No. 11 at PageID.70. One of Defendant's rights held in abeyance was his exclusive right to direct the boxing services of Franklin for the contract period. Accordingly, the contract period of four years and six months, or 1,643 days, began on December 16, 2014 but was tolled on March 1, 2019, leaving a total of 107 days remaining. Two years must be added to this sum because Defendant has, pursuant to a prior stipulated order, exercised his option under paragraph three to extend the Agreement by placing $25,000 in escrow. ECF No. 24. Accordingly, the Agreement will remain in force for 837 days, during which time, both Defendant and Franklin are obligated to faithfully execute their duties under the Agreement as so stated therein.

Based on the foregoing, a separate judgment will be entered declaring (1) that Franklin may not unilaterally terminate the Agreement, (2) that Defendant remains Franklin's manager, and (3) that 837 days remain on the Agreement. Consistent with that judgment, the $25,000 held in escrow will be disbursed to Franklin.

## IV.

Franklin's motion for summary judgment requests, *inter alia*, an order requiring Defendant to produce his "signed filed tax returns for years 2014 – 2018" and to pay for "any interest, penalties and tax liabilities that Franklin may owe." ECF No. 54 at PageID.817–18. For the reasons stated below, Plaintiff's motion for summary judgment will be denied.

**A.**

Under Michigan law, Defendant, as Franklin's fiduciary, must account for all monies belonging to Franklin. *Cass Cty. v. Shattuck*, 285 N.W. 454, 456 (Mich. 1939); *see also* 1 Mich. Civ. Jur. Agency § 108 ("[I]t is the agent's duty to account to the principal for all money and property belonging to the latter that comes into his or her possession during the course of the agency."). However, "[a]n accounting is an extraordinary equitable remedy and is only available when legal remedies are inadequate." *McDonald v. Green Tree Servicing, LLC*, No. 13-12993, 2014 WL 1260708, at *8 (E.D. Mich. Mar. 27, 2014) (citing *Bradshaw v. Thompson*, 454 F.2d 75, 79 (6th Cir.1972)). "A plaintiff may bring an action for accounting if the plaintiff is uncertain of the amounts he or she is entitled to recover." *Miller v. Laidlaw & Co. (UK)*, No. 11-12086, 2012 WL 1068705, at *13 (E.D. Mich. Mar. 29, 2012) (citing *Basinger v. Provident Life & Acci. Ins. Co.*, 239 N.W.2d 735, 738 (Mich. Ct. App. 1976). "Accounting is inappropriate when discovery could determine the amounts at issue . . . Indeed, in light of the broad discovery available to litigants, accounting actions are of dubious utility." *Kerrigan v. ViSalus, Inc.*, 112 F. Supp. 3d 580, 618 (E.D. Mich. 2015) (internal citations, quotation marks, and alterations omitted).

**B.**

In this case, Defendant has fully accounted for all monies belonging to Franklin. On April 15, 2019, ten months before discovery began under a scheduling order, Defendant agreed by stipulated order to produce a number of documents relating to his management of Franklin, including:

- Information and/or documents regarding payments to the [Franklin] related to the seventeen (17) fights [Franklin] had under Defendant, including Bout Agreements (to the extent there were any), purse amounts, and payments to promoters and/or others and opponents . . . ; and

- Information and/or documents regarding Defendant's payment of "miscellaneous expenses" per § 2(f) of the [Agreement] from December 16, 2014 through August 27, 2018 paid to [Franklin], or on behalf of [Franklin], or to [Franklin's] family, or anyone else associated with the seventeen (17) fights [Franklin] had under Defendant.

ECF No. 17 at PageID.182. The next day, Defendant produced an itemized accounting of expenses incurred while managing Franklin, including Franklin's purses, amounts paid to Franklin's opponents and promoters, and a plethora of miscellaneous expenses. ECF No. 56-1. During discovery, Defendant produced other documents, including "file memos; bank statements; [and] Schedule C Profit Loss statements." ECF No. 54 at PageID.808.

Nonetheless, Franklin claims that Defendant has yet to fully account for "Franklin's finances," pointing to discrepancies in the documents produced.[18] ECF No. 59 at PageID.938. He also questions Defendant's tax treatment of management-related expenses.[19] *Id.* at PageID.939–42. Franklin's reasoning is misguided. While Defendant must account for all monies belonging to Franklin, he is not Franklin's accountant. Franklin admits that he received his signing bonus, first-year salary, and the full amount of every purse under Defendant's management. ECF No. 52-2 at PageID.769, 772. He has not produced any evidence that Defendant improperly withheld monies.

Moreover, Franklin has not explained what he expects to discover by reviewing more of Defendant's personal tax filings. Defendant also persuasively argues that if Franklin thought

---

[18] For instance, Franklin claims that certain handwritten notations on Defendant's accounting are inconsistent with the accounting itself. *See* ECF 59 at PageID.937–38; *see also* ECF No. 59-2 (Defendant's accounting as produced in discovery).

[19] Franklin seems to disagree that amounts paid to him or on his behalf for training and personal expenses were income to him. ECF No. 59 at PageID.940–41. While this Court need not decide the issue, Franklin is likely misconstruing the term "gross income" as used in the Internal Revenue Code. *See Hawkins v. United States*, 30 F.3d 1077, 1079 (9th Cir. 1994) ("An accession to wealth, . . . is presumed to be taxable income, unless the taxpayer can demonstrate that it fits into one of the Tax Code's specific exemptions.") (citing *Comm'r v. Glenshaw Glass Co.*, 348 U.S. 426, 430 (1955)).

Defendant's tax returns were relevant, he should have tried to compel their production during discovery. *See Phillippi v. Jim Phillippi, Inc.*, No. 2:07-CV-1001, 2009 WL 1911763, at *2 (S.D. Ohio June 26, 2009) ("[Plaintiff] has a liberal discovery right to determine the extent to which Defendants allegedly commingled and misused corporate funds . . . But if [Plaintiff] is dissatisfied with Defendants' discovery responses, his appropriate remedy is a motion to compel discovery— not an accounting claim."). Of course, Defendant could have provided an accounting sooner— when he was first asked to do so in August 2018—but, now that he has, Franklin cannot evade summary judgment on the bare assertion that Defendant *might* have retained unknown monies.

Accordingly, Defendant has fully accounted for monies belonging to Franklin. Franklin's motion for summary judgment will be denied, and summary judgment will be entered in Defendant's favor.

## V.

Franklin also moves for leave to amend his affirmative defenses to Defendant's counterclaim. ECF No. 48. He proposes three defenses: (1) material breach, (2) fraudulent inducement, and (3) breach of the implied covenant of good faith and fair dealing. *Id.* at PageID.629. Franklin's motion will be denied because, as explained below, each affirmative defense would be futile.

## A.

Franklin's request to add an affirmative defense of material breach is moot given this Court's finding that there is no genuine dispute as to the lack of a material breach. *See* Section III.A., *supra*. Indeed, most of Franklin's discussion on this affirmative defense relies on his characterization of the "best efforts" clause and the involvement of Acri. ECF No. 48 at PageID.631–34. The record reveals no basis from which a reasonable trier of fact could conclude

that Defendant materially breached the Agreement. Accordingly, adding an affirmative defense of material breach would be futile.

## B.

Franklin next seeks to add an affirmative defense of fraudulent inducement. *Id.* at PageID.636–37. In support, Franklin alleges that his assent was induced by misrepresentations about Defendant's "qualifications," "connections," and overall management ability. *Id.* Similar allegations were previously rejected for a lack of particularity and legal support. *See* ECF No. 29 (dismissing fraud count); ECF No. 37 (rejecting silent fraud defense). Additionally, Franklin's allegations are belied by his own deposition testimony:

> Q: Okay. And what – what about the experience or what was said in Pittsburgh led you to ultimately signing the agreement for him to become your manager?
>
> A: Honestly, what led – it was his – his words. Like verbally – I don't – I'm going to be honest, I'm – I'm still learning about contracts still to this day so I'm still understanding certain stuff that be in contracts, but honestly, it was his words. Like he made me feel – he made me feel like he – like he would have really care or he had my best interests at heart in the beginning. But after – after we signed, you know, started to go through, started to build a relationship, I could kind of tell that wasn't what it was . . . .

ECF No. 52-2 at PageID.766. Franklin's testimony, at most, shows that Defendant's attitude or demeanor left him with an inaccurate impression of how Defendant would manage his career.[20] However, "[a] plaintiff's subjective misunderstanding of information that is not objectively false or misleading cannot mean that a defendant has committed the tort of fraudulent misrepresentation." *Tocco v. Richman Greer Prof'l Ass'n*, 912 F. Supp. 2d 494, 516 (E.D. Mich.

---

[20] Franklin's testimony, while inconsistent, raises some question as to whether Defendant represented himself as licensed in Pennsylvania to manager boxers. *See* ECF No. 52-2. However, Franklin's direct testimony on the issue of inducement makes no mention of fraud, and his briefing fails to explain how the alleged representation could reasonably induce assent. *See Smith Living Tr.*, 928 N.W.2d at 239. Indeed, paragraph 10 of the Agreement states, "Manager and Boxer will become licensed when and where necessary, in the appropriate jurisdiction, at the appropriate time, at the discretion of Manager." ECF No. 18-2.

2012), *aff'd*, 553 F. App'x 473 (6th Cir. 2013); *see also Smith Living Tr. v. Erickson Ret. Communities*, 928 N.W.2d 227, 239 (Mich. Ct. App. 2018) ("To prevail on a theory of fraud in the inducement, a plaintiff must prove five essential elements, one of which is reasonable (or justified) reliance.").

Furthermore, part of Franklin's reasoning rests on a clear misreading of the record. Franklin asserts that Defendant contradicted himself in his deposition by admitting that he managed one boxer before Franklin when his prior declaration "indicates he managed 15 Pennsylvania boxers." ECF No. 57 at PageID.894–95. Franklin cites to a portion of Defendant's March 2019 declaration where he states,

> At the time the [Agreement] was signed, I was aware that Pennsylvania had certain requirements related to Boxer-Manager contracts. However, I did not believe that Pennsylvania was the applicable jurisdiction because Mr. Franklin was not a Pennsylvania resident, and was not registered or licensed in Pennsylvania. The State of Pennsylvania maintains a list of all Boxer-Manager contracts that have been filed with the State. [citation to Pennsylvania list of contracts]. I have confirmed that all 15 of the boxers listed reside in Pennsylvania.

ECF No. 14-1 at PageID.139. Defendant was not claiming to have managed 15 boxers. He is confirming that the 15 boxers on the Pennsylvania list were residents of Pennsylvania—a fact that supported his choice of law discussion. *Id.* Based on the foregoing, it would be futile to permit Franklin to add the fraudulent inducement defense.

## C.

Franklin's final proposed defense would also be futile. Relying on *Burkhardt v. City Nat. Bank of Detroit*, 226 N.W.2d 678 (Mich. Ct. App. 1975), Franklin claims that Michigan courts apply a duty of good faith and fair dealing where one party's performance is "a matter of its own discretion." ECF No. 48 at PageID.635. *Burkhardt*, however, is an exception to the general rule and is often distinguished. *See*, *e.g.*, *Mathew Enter., Inc. v. Chrysler Grp. LLC*, No. 13-CV-04236-

BLF, 2014 WL 3418545, at *10 (N.D. Cal. July 11, 2014) (recognizing *Burkhardt* but clarifying that the implied covenant "is dependent on the contractual obligations fixed by [and] emanating from the terms of the contract" and that "such a duty will not be recognized when one party is vested with express authority with regard to a particular matter"); *Graham v. Bank of Am.*, No. 12-13574, 2013 WL 3471126, at *2 (E.D. Mich. July 10, 2013) ("Michigan law does not recognize an implied duty of good faith and fair dealing, when the parties'[] rights are governed by a written contract."); *Cheesewright v. Bank of Am., N.A.*, No. 2:11-CV-15631, 2013 WL 639135, at *4–5 (E.D. Mich. Feb. 21, 2013) ("[T]he policy concern at issue in *Burkhardt*—which dealt with escrow accounts—no longer applies after the enactment of the Real Estate Settlement Procedures Act.").

Here, Franklin alleges that Defendant acted in bad faith by refusing to put him on a televised Showtime event in August 2017. ECF No. 48 at PageID.635. However, the Agreement vested Defendant with the authority to direct Franklin's services. *C.f. Mathew Enter., Inc.*, 2014 WL 3418545, at *10 ("[The] duty will not be recognized when one party is vested with express authority with regard to a particular matter."). Additionally, there is no evidence to substantiate Franklin's claim that he was refused in bad faith. Defendant's internal records indicate that by the time Franklin mentioned the Showtime event, he already had a bout scheduled for the prior weekend. ECF No. 48-6 (Defendant's internal memo). Indeed, after nearly two years of litigation, Franklin has failed to produce any evidence of bad faith.

Based on the foregoing, Franklin's motion to amend his affirmative defenses will be denied because his proposed amendments would be futile.

## VI.

Accordingly, it is **ORDERED** that Defendant's Motion for Summary Judgment, ECF No. 52, is **GRANTED IN PART**. A judgment shall be entered declaring (1) that Franklin may not

unilaterally terminate the Agreement, (2) that Defendant remains Franklin's manager, and (3) that 837 days remain on the Agreement, and further ordering that the $25,000 held in escrow be disbursed to Plaintiff Jermaine Franklin, Jr.

It is further **ORDERED** that Plaintiffs' Motion for Summary Judgment, ECF No. 54, is **DENIED**.

It is further **ORDERED** that Plaintiffs' Motion for Leave to Amend Their Affirmative Defenses, ECF No. 48, is **DENIED**.

It is further **ORDERED** that Plaintiffs' Amended Complaint, ECF No. 18, is **DISMISSED**.

It is further **ORDERED** that Defendant is **DIRECTED** to submit a proposed judgment consistent with this Order through CM/ECF Utilities/Proposed Orders by **November 13, 2020**.


Dated: November 6, 2020                          s/Thomas L. Ludington
                                                 THOMAS L. LUDINGTON
                                                 United States District Judge